UNITED STATES *v.* MERCANTIL DISTRIBUIDORA, S. A., EMPACADORA TREVINO, S. A., THE TUPMAN THURLOW CO., INC. (No. 4923)[1]

United States Court of Customs and Patent Appeals, November 22, 1957

*George Cochran Doub*, Assistant Attorney General and *Richard E. FitzGibbon*, Chief, Customs Section for the United States.

*Lawrence & Tuttle* and *Barnes, Richardson & Colburn* (*Lawrence A. Harper, Albert MacC. Barnes, J. Bradley Colburn*, and *Joseph Schwartz* of counsel) for appellees.

[ Oral argument October 9, 1957, by Mr. FitzGibbon and Mr. Schwartz]

Before JOHNSON, Chief Judge, and O'CONNELL, RICH, and JACKSON (retired), Associate Judges

RICH, Judge, delivered the opinion of the court:

The Government's appeal in this case brings before us a retrial (or more realistically a reargument) of the issues decided by this court in *The United States* v. *Mercantil Distribuidora, S. A., Joseph H. Brown*, 43 C. C. P. A. (Customs) 111, C. A. D. 617, which we shall refer to for convenience as "the former case" or "CAD 617." The record

---

[1] C. A. D. 667.

in that case was incorporated in the record in this case which involves three protests, consolidated for trial, suspended pending the outcome of the former case. The government being unwilling to stipulate these protests under the former decision of this court, they were returned to the calendar and brought to trial. No new testimony was taken but two bits of evidence were added to the record as exhibits and a stipulation was entered into.

The merchandise involved was invoiced as boneless cured beef.[1] By the stipulation the parties have agreed that it is of the same character as the beef involved in CAD 617, wherein its method of preparation was set forth at length. For this opinion it will suffice to say that it is beef imported from Mexico and Argentina which was boned, cut in pieces and treated with 4% to 4½% of salt which, while it permeated the meat, was not sufficient to preserve the meat against spoiling for more than a few days in the absence of refrigeration. It was stipulated that this was "prepared" meat.

The collector classified this beef under paragraph 706 of the Tariff Act of 1930 as modified by the trade agreement with Paraguay (T. D. 51649). These read as follows:

Tariff Act of 1930:

Par. 706. Meats, fresh, chilled, frozen, prepared, or preserved, not specially provided for, 6 cents per pound, but not less than 20 per centum ad valorem.

Trade Agreement with Paraguay:

706 Meats, prepared or preserved, not specially provided for (except meat pastes other than liver pastes, packed in air-tight containers weighing with their contents not more than 3 ounces each). — 3¢ per lb., but not less than 20% ad valorem

The classification under these provisions was as meats, prepared or preserved, not specially provided for. It is the *ad valorem* minimum which is significant, it having been stipulated that "duty at the rate of 3 cents per pound is less than 20% ad valorem."

The importer protested, and the Customs Court held, that the beef should be charged with duty under the further revision of paragraph 706 made by the General Agreement on Tariffs and Trade (T. D. 51802) which reads:

706 Meats, prepared or preserved, not specially provided for, (*except* beef packed in air-tight containers and pickled or *cured beef* or veal). (Italics ours.) — 3¢ per lb., but not less than 10% ad val.

Thus the issue here, as it was in the former case, is whether the *ad valorem* minimum is 10% or 20% and this in turn depends on whether the imported meat is or is not "cured beef" within the meaning of

[1] The Customs Court appears to have been fully justified in finding in the former case, on the testimony, that it was required by the Bureau of Animal Industry to be labeled as "cured" when a significant quantity of salt has been applied to the meat and has permeated it, even if it was not "cured beef" as the term was commonly understood.

that term as used in the exception clause in the above-quoted provision of G.A.T.T. It might be well to point out that we are not here concerned with any "cured" meat product other than the "cured beef" specifically referred to in the General Agreement nor with the meaning of "cured" in any other context.

In the former case the Customs Court, after consideration of an extensive trial record (295 printed pages of trial proceedings), reached the conclusions set forth in the following paragraphs:

> We conclude that the term meat or beef, "cured", commonly, and as used in trade agreements, refers to meat which has been preserved so that it will keep for a long time without refrigeration. It is inconceivable that a period of from 1½ to 8 days could by any stretch of the imagination be called a "long time". Only one of the Government's many witnesses, and none of the plaintiffs' witnesses, estimated that this type of merchandise would keep for a longer period.
>
> \* \* \* \* \* \* \*
>
> Since the merchandise involved herein has not been so processed as to be permanently preserved, it is not "preserved" within the meaning of the tariff statutes, nor is it "cured" within the common meaning of that term. In our view, such merchandise, which would keep no more than a few days without refrigeration, is not "cured", even though it has been permitted entry under a Bureau of Animal Industry regulation providing that it must be "thoroughly cured."
>
> We hold, therefore, that the merchandise involved herein is prepared meat, but it is not "cured beef", as that term is commonly understood. Consequently it does not fall within the exception in paragraph 706 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade \* \* \*.

This conclusion as to the meaning of "cured beef" in G.A.T.T. was neither easily nor arbitrarily arrived at. Consideration was given to the testimony of 17 witnesses for the plaintiff and 9 for the government who, as might be expected, flatly disagreed on the meaning of the term. As the Customs Court said,

> The testimony herein brings out two meanings for the term "cured", as used in reference to meat. The first, given by plaintiffs' witnesses, is that "cured" meat is meat which has been so treated *that it will keep indefinitely without refrigeration.*
>
> \* \* \* \* \* \* \*
>
> The second meaning, stated chiefly by defendant's witnesses, is that beef is "cured" *when salt has penetrated throughout the meat.* In their opinion, curing with salt is a process used primarily for flavoring purposes and is not to provide stability. (Italics ours).

We observe in passing that what is or is not a curing process is not the issue, but rather what G.A.T.T. means by "cured beef".

Since the conflicting testimony was obviously of no help in resolving the issue, the court properly turned to other aids to interpreting the meaning as intended by the authors of G.A.T.T., and antedating its drafting, namely various lexicons, state court decisions, the Summaries of Tariff Information and the Digests of Trade Data, from

which it reached the conclusion above stated that the imported merchandise was not "cured beef".

On appeal to this court, the judgment of the Customs Court, and the grounds on which it was based, were affirmed in CAD 617 for essentially the same reasons, two judges dissenting without opinion and one concurring only in the result reached. The conclusion of the majority was stated as follows:

Thus, every aid to interpretation of the negotiators' intent that we have been able to find supports appellees' [importers'] contention that the term "cured beef" as used in the trade agreement refers to meat which had been preserved for use where refrigerated storage is lacking. * * * We conclude, therefore, that the term, "cured beef" as used in the General Agreement on Tariffs and Trade did not include meat of the character involved here, which would not be suitable in places where refrigerated storage is inadequate.

Possibly because of the lack of unanimity in this court in the former case, the Government, without any new testimony and on the same record as that heretofore before the court, supplemented only by two exhibits which bring before us nothing not previously considered, has been emboldened to reargue the identical issue in the hope of persuading the court (which has undergone a change) that the result reached in CAD 617 was wrong.

In the instant case the Customs Court held unanimously by a full court that the decision of this court in CAD 617 "is *stare decisis* of this litigation." The Government appears to have contended below that the former decision of this court was not *stare decisis* because of two erroneous findings of this court: (1) that the court was *not bound* by the interpretation of the word "cured" by the Bureau of Animal Industry, Department of Agriculture, in applying its Order 373 (9 C. F. R. Part 94), relating to the importation of "cured meats," *inter alia*, from certain countries infested with foot-and-mouth disease; and (2) that this court found that the term "cured" had *two* common meanings and then limited its meaning as used in G.A.T.T. to only one of them. These are the two "Points" the Government has briefed before us on this appeal and we shall come to them in due course. But first a word about *stare decisis*.

We deem the action of the Customs Court in adopting the construction this court placed on the term "cured beef" in CAD 617—the record before it being the same in all material respects—by application of the rule of *stare decisis*, to have been entirely proper, if not inescapable. The case now comes to us and we are asked not only to reverse the Customs Court but to reverse the decision this court made a year and a half ago on said record. The rule of *stare decisis*, sometimes known by another Latin phrase meaning "not to disturb what is settled," is applicable here too. The public policy of putting an end to litigation and of not reopening questions which have been

decided is a sound one, subject only to the qualification that *clear* error should not be perpetuated. Courts should maintain an open mind and give thoughtful consideration to sincere arguments that they should reverse themselves. But it must be remembered that when they do this they unsettle the law and add to the turmoil of this world, which already has enough. Hence sound policy dictates that prior decisions shall stand until the court is *convinced* they are wrong. Many appeals involve close questions on which men may reasonably differ and in such cases we feel that the statement of Mr. Justice Brewer quoted by appellees from *Hartranft* v. *Meyer*, 149 U. S. 544, 547, that "A change in the personnel of a court should not mean a shift in the law" is apt.

The interpretation of words in a statute or treaty is a question of law to which the rule of *stare decisis* applies and it has often been so applied by this court. In *U. S.* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. (Customs) 146, 151, T. D. 48009, the court adhered to its prior interpretation of the term "blades" under the rule because it was not "convinced that its former decision was erroneous." In *Del Gaizo Distributing Corp., et al.* v. *United States*, 24 C. C. P. A. (Customs) 64, T. D. 48376, the court adhered to its definition of "pastes" in a prior case, saying, page 67,

The argument upon the "pastes" phase of the controversy is almost wholly upon questions of law *without any facts being offered* sufficient to differentiate this case from the *Columbo Co. et al.* case *supra* [21 C. C. P. A. (Customs) 302].

We are not convinced that our conclusion there reached was erroneous upon the questions of law * * *. (Emphasis ours).

See also *American Mail Line, Ltd.* v. *U. S.*, 24 C. C. P. A. (Customs) 72, and *Burstein & Sussman* v. *U. S.*, 16 Ct. Cust. Appls. 282, the latter being a case like the present, where the merchandise was the same as in the prior case, the record of which was the sole record relied on.

We turn then to the question of whether the Government, appellant, has convinced us that the decision in CAD 617 on the meaning of "cured beef" in the G.A.T.T. modification of paragraph 706 is so obviously wrong that it should be overruled.

Firstly, we fully agree with the Customs Court's analysis of the two exhibits added by the new record, they being the only new evidence, as "nothing significant" and adding little. In effect, we are asked to reverse and overrule on the same record on the basis of a reargument.

The Government's first point as briefed and argued is but a repeat performance of the contention made in the former case and is based on Order 373 of the Bureau of Animal Industry (B. A. I.).[2] This

---

[2] One of the two new exhibits is a copy of B. A. I. Order 373, of which the courts took judicial notice in the former case.

court gave it full consideration which can be read at 43 C. C. P. A. (Customs) at pages 115 and 116, C. A. D. 617, it will not be repeated here. The gist of the situation, however, is that B. A. I. Order 373 permitted the importation of meat from countries where foot-and-mouth disease had been declared to exist only if the meats were "cured or cooked" in accordance with specifications set forth in the order. As to "cured meats" the order specified, *inter alia,*

(3) The meat shall have been thoroughly cured by the application of dry salt or by soaking in a solution of salt.

The importer has always conceded that its merchandise complied with the order, the following concession by its counsel appearing on the record in this case: [3]

* * * plaintiff has always admitted in both courts that the meat was cured, in the sense of that word as used in B. A. I. Order 373, and we admit it again today.

In the former case the Customs Court said, "Regulations by the Department of Agriculture are not controlling in customs cases in all circumstances." And in affirming, this court said that "the claim that the meaning of the regulation would be binding upon this court in determining tariff usage was correctly rejected by the court below." This court also said—and here is the rub—"Government counsel does not attempt to urge here that the B.A.I. regulation does have binding effect." Quoting this in the trial proceedings below, Government counsel said,

I want to make certain in this case that the Government does urge that the BAI Regulations do have binding effect. They were issued under Section 306 of the Tariff Act, and it is our position that they do have binding effect, and that is why we want to present this case to the Court.

That is the initial statement of the Government's first point and the gist of it. It is a point on which it is suggested that this court "was led into error." [4]

We have not been convinced that this court erred in deciding that a Department of Agriculture (BAI) regulation, or the interpretation placed upon it by those charged with its enforcement for the purpose of protecting the livestock of this country against infestation with

---

[3] Certain affidavits, collectively offered as Exhibit V, constituting the other of the two new exhibits in the record of this case, merely go to show what appellee has conceded, for which reason they make no material difference in the record. Nor does appellant contend that they do.

[4] In this connection we have noted with some interest the following remarks of another government counsel in the incorporated record (pp. 232–233), made in objecting to a question put to a witness by counsel for the importer on the meaning of "cured" in BAI Order 373: "'* * * 'cured' as used in the Trade Agreement is not necessarily the same as 'cured' as the B. A. I. used it. * * By the same token this court has held upon innumerable occasions that what may be defined as a drug, according to the Pure Food & Drug Act, is not necessarily a drug for tariff purposes. We have had instances of that * * *. *I submit what one department or one agency's theory or definition of an expression or term is, is not binding in any way upon the Customs.* 'Cured' was used in the Trade Agreement. What difference does it make how the B. A. I. used the word 'cured'? But he is now asking him the B. A. I. conception of what 'cured' meant, *and that has nothing to do with the issue before the court.*" (Emphasis ours.)

disease, is not binding upon us in interpreting words in a trade agreement the purpose of which is to fix import duties. Appellant's criticism of the citation of *F. W. Myers & Co., Inc.* v. *United States*, 29 C. C. P. A. (Customs) 30, C. A. D. 167, by the Customs Court does not impress us. In that case beef livers from Canada destined for a pharmaceutical house to be made into medicines were certified by the foreign government to be "inedible and unfit for food," on the basis of which the B. A. I. of the Department of Agriculture permitted delivery without inspection, an obvious acceptance of the statement of the certificate. This court refused to be bound by this action and held the livers to be "edible" for the purpose of determining their tariff classification. While the case may not say in so many words that B. A. I. regulations are not binding in customs matters, the implication is clear. Furthermore, the cases of *C. J. Tower & Sons* v. *United States*, 30 Cust. Ct. 235, C. D. 1526, and *Gallagher & Ascher Co.* v. *United States*, 24 Cust. Ct. 1, C. D. 1199, relied on by appellant, both state specifically that definitions and standards established by the Department of Agriculture are "not necessarily controlling in customs procedure," though they may be "pertinent." Pertinent is a synonym of relevant and relevancy we do not deny, but that is not what is being urged upon us. Perhaps the most pertinent of the cases cited to us is *Merck* v. *United States*, T. D. 33463, 24 Treas. Dec. 824, wherein an importation of decaffeinated coffee beans was held dutiable as coffee in spite of Food and Drug regulations prohibiting its sale as coffee.

One further argument on this point is that B.A.I. Order 373 was "issued under authority of a section of the tariff act itself Section 306." To this there are three answers. First, while Section 306 was enacted as a part of the Tariff Act, it has nothing whatever to do with classification or the fixing of duties. Its purpose is to prohibit importation in certain cases. Second, the regulations, B.A.I. Order 373, as we read them, do not purport to define anything. As to cured meats, they merely set the conditions which must be met if they are to be imported at all. Third, the regulations appear to be equally based on another law, 32 Stat. 791, approved February 2, 1903, the Animal Quarantine Act, and were evidently regarded as so based by the agency charged with their promulgation.

Appellant's second point, and the last, is an argument built upon the wording of paragraph 706 itself as amended by the General Agreement, quoted above, by which the *ad valorem* rate was reduced to 10%, the benefit of which reduction was denied to "cured beef." The argument is a verbal exercise of no little ingenuity. "Language is not only a school of wisdom but also a school of folly." [5] The

[5] "The Myth of the State" by Ernst Cassirer, Doubleday Anchor Book A52, p. 22.

argument runs that there are two common meanings of "cured": (1) to permanently preserve and (2) to prepare with salt so that the salt thoroughly penetrates the meat; that this court, by adopting only the first, created a nonexistent ambiguity; that paragraph 706 of G.A.T.T. should be read as referring to meat "prepared by curing" and to meat "preserved by curing," thus reading in both common meanings, removing any ambiguity as to the meaning of "cured" and making unnecessary any use of aids to interpretation. At least that is how we understand it and possibly we have oversimplified it. Our difficulty is that nowhere can we find any justification for discussing either preparing by curing or preserving by curing because these concepts are original with appellant and not in the General Agreement, which speaks simply of "Meats, prepared or preserved, not specially provided for" and then excludes "cured beef." In the former case this court went about the problem of determining the meaning of "cured beef" by determining in the classical manner the probable intent of the negotiators and, again, we are not convinced that it thereby wrought such havoc as to create difficulty in the future application of the words of paragraph 706. In fact we feel that by making the meaning of "cured beef" more definite, interpretation was simplified and that to undo what was there done would be the sure road to confusion.

Appellant having failed to convince us either by new evidence or argument that there was clear error in the decision of the former case, C. A. D. 617, and considering the soundness of not disturbing what has once been settled unless clear error is shown, we hold that the rule of *stare decisis* is applicable and the judgment of the Customs Court is *affirmed*.

WORLEY, J., was not present at the argument of this appeal and did not participate in the decision.

JACKSON, J., Retired, recalled to participate.